## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**ROBERTO RIVAS,**

       **Plaintiff,**

**vs.**                                                                 **No.  02cv1165 DJS**

**JO ANNE B. BARNHART,**
**COMMISSIONER OF SOCIAL SECURITY,**

       **Defendant.**

## MEMORANDUM OPINION

This matter is before the Court on Plaintiff's (Rivas') Motion to Reverse and Remand for a Rehearing **[Doc. No. 7]**, filed February 10, 2003, and fully briefed on April 25, 2003.  The Commissioner of Social Security issued a final decision denying Rivas' application for disability insurance benefits.  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds the motion to reverse is well taken and will be GRANTED.

### I.  Factual and Procedural Background

Rivas, now almost sixty-two years old (D.O.B. September 17, 1941), filed his current application for disability insurance benefits on October 13, 1999, alleging disability since April 15, 1981, due to hearing problems, post traumatic stress disorder, a heart condition, vision problems, depression, problems with both knees and a rash.  Tr.103.  At the Administrative hearing, Rivas' counsel also argued that Rivas met Listings 12. 06 (Anxiety Related Disorders) and 12.07 (Somatoform Disorders).  Tr. 58-59.  Rivas previously filed an application for disability insurance

benefits that was denied on November 6, 1981, and not further appealed.  Tr. 113.  Rivas has an

eleventh grade education and past relevant work as an owner of a junk yard, farmer, welder, auto

repairman, and painter.  Tr. 104.

On March 30, 2001, the Commissioner's Administrative Law Judge (ALJ) denied benefits.

Tr. 41-45.  The ALJ found "the objective evidence [did] not support the existence of impairments

that affected Mr. Rivas' ability to perform basic work activities during the period from 15 April

1981 through 31 March 1983."  Tr. 43.  Accordingly, at step two of the sequential evaluation

process, the ALJ found "that Mr. Rivas did not have a 'severe' impairment then."  *Id.*  Rivas filed

a Request for Review of the decision by the Appeals Council.  On June 4, 2001, Rivas' submitted

a seventeen page Memorandum from a representative of the Rehabilitation Services & Veterans

Programs to the Appeals Council, asserting he met and/or equaled Listings 12.07 (Somatoform

Disorder/Conversion Disorder), 12.04 (Affective Disorder/Major Depression); 12.03

(Schizophrenic, Paranoid and Other Psychotic Disorders), and 12.06 (Anxiety Related

Disorders/PTSD).  Tr. 20-36.  On July 12, 2002, the Appeals Council denied Rivas' request for

review of the ALJ's decision.  Hence, the decision of the ALJ became the final decision of the

Commissioner for judicial review purposes.  Rivas seeks judicial review of the Commissioner's

final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final

decision is supported by substantial evidence and whether he applied correct legal standards.

*Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992).

Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989). "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met. *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)). The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications.

20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled.  *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show he is not engaged in substantial gainful employment, he has an impairment or combination of impairments severe enough to limit his ability to do basic work activities, and his impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or he is unable to perform work he had done in the past.  20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering his residual functional capacity, age, education, and prior work experience. *Id.*

In support of his motion to reverse, Rivas makes the following arguments: (1) the ALJ failed to complete a proper step four analysis because he did not fulfill his duty to develop the record; and (2) the ALJ failed to consider his impairments in combination.

## A.  Step Two of the Sequential Evaluation Process

At step two of the sequential evaluation process, the ALJ found Rivas did not have a severe impairment during the time in question, from April 15, 1981, to March 31, 1983.  Thus, because the ALJ found Rivas was not disabled at step two, the sequential evaluation process ended there.  *See*, *Thompson*, 987 F.2d at 1487.

While Rivas bears the burden of proving his disability, at step two, his burden is "de minimis."  At step two, a claimant is required only to make a "de minimis showing" that his medically determinable impairments, in combination, are severe enough to significantly limit his ability to perform work-related activity.  *Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir.

1988).  Although an impairment is not severe if it has no more than a minimal effect on an individual's physical or mental abilities to do basic work activities, the possibility of several such impairments combining to produce a severe impairment must be considered.  *See* SSR 85-28, 1985 WL 56856, at *3, *4 (1985).

Under 20 C.F.R. § 404.1523, when assessing the severity of whatever impairments an individual may have, the adjudicator must assess the impact of the combination of those impairments on the person's ability to function, rather than assess separately the contribution of each impairment to the restriction of his or her activity as if each impairment existed alone.  A claim may be denied at step two only if the evidence shows that the individual's impairments, when considered in combination, are not medically severe, i.e., do not have more than a minimal effect on the person's physical or mental abilities to perform basic work activities.   20 C.F.R. § 404.1521.  If such a finding is not clearly established by medical evidence, however, adjudication must continue through the sequential evaluation process.  20 C.F.R. §§ 404.1523.  "In other words, step two is 'an administrative convenience to screen out claims that are 'totally groundless' solely from a medical standpoint.'"  *Church v. Shalala*, No. 93-7070, 1994 WL 139015, at **2 (10th Cir. April 19, 1994)(quoting Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1998).

In this case, the ALJ's finding, at step two, that the objective evidence did not support the existence of impairments that affected Rivas' ability to perform basic work activities during the period in question is not supported by substantial evidence.  The medical records available to the ALJ indicate as follows:

**Hospitalization at VAMC in Denver, Colorado, April 5-14, 1981**

On April 5, 1981, Rivas was admitted to VAMC in Denver, Colorado and discharged on April 14, 1981.  Tr. 279-281, 248-273.  Rivas' chief complaints were diplopia (double vision) for three days and "dizziness with decrease in balance times four days."  Tr. 279.  Rivas was thirty-nine at the time.  Rivas' wife reported his unsteadiness had been slower in onset over the past week to ten days.  Rivas reported he had developed pinkeye ten days prior to admission, a sore throat six days prior to admission, and two days prior to admission he noticed double vision in all directions while he was working on a car.  The pinkeye and sore throat resolved without treatment.  One day prior to admission, Rivas reported his double vision had gotten worse and he was now unsteady on his feet.  On that day, he spent the day lying down.  Rivas also complained of bilateral palmar numbness.

Rivas' medical history reflected heavy alcohol intake during his tour in Vietnam but reported he stopped drinking in 1970 when his tour ended.  Rivas also reported experiencing similar symptoms while in Viet Nam.  Tr. 270.  The physical examination revealed the following abnormalities:

(1)     Eye exam– left eye-partial internuclear[1] ophthalmoplegia[2] with nystagmus[3] of the abducting eye in both the right and left eye; the abducting eye usually was able to cross       the midline and almost fully adduct.  There was diplopia upon looking left after a minute       or two.

(2)     Motor exam– gait was very wide based, very ataxic[4] gait; heel-to-toe was very unsteady, station was very wobbly, station with eyes closed very wobbly.  There was slight motor weakness compared to the left in the right triceps, the right abduction of the arm deltoids, and right extension of the wrist.  In the lower extremities there was also a hint of right extremity weakness in comparison to the left at the right hamstring.

(3)     Coordination– finger-to-nose was ataxic, left greater than right, with the same for rapid alternating movements and heel-to-shin.

(4)     Reflexes– none could be obtained except plantar, which was bilaterally downgoing.

(5)     Sensory– vibration decreased in both hands only.  There was a nonspecific numbness on both palms.

Tr. 280.  The attending physician opined that "it was most likely felt that this patient's diagnosis was MS (multiple sclerosis)."  *Id.*  During his hospital course, Rivas' ataxic gait greatly improved,

---

[1] Internuclear.  Between nerve cell groups in the brain or retina.  *Stedman's Medical Dictionary* 883 (26th ed. 1995).

[2] Opthalmoplegia is the paralysis of one or more of the ocular muscles.  *Stedman's Medical Dictionary* 1254 (26th ed. 1995).

[3] Nystagmus is the rhythmical oscillation of the eyeballs, either pendular or jerky.  *Stedman's Medical Dictionary* 1233 (26th ed. 1995).

[4]  Ataxia is an inability to coordinate muscle activity during voluntary movements, so that smooth movements occur.  Most often due to disorders of the cerebellum or the posterior columns of the spinal cord; may involve the limbs, head, or trunk.  *Stedman's Medical Dictionary* 161 (26th ed. 1995).

7

as did his diplopia.  *Id.*  "The nystagmus with the abducting eye decreased, as did the ability for the eye to adduct fully, which seemed to be resolving INO (internuclear ophthalmoplegia)."  Tr. 281.  However, at time of discharge, Rivas' diplopia increased.  This "was grossly apparent in horizontal gaze; the eyes did not move in a conjugate fashion."  *Id.*  Additionally, there was an increase in the INO with consequent inability to abduct the eyes adequately.  *Id.*  The nystagmus increased, requiring the use of a patch over his eye so that he would not see double and be able to walk better.  The attending physician scheduled visual-evoked responses[5] and set up an appointment with the Neurology Clinic.  *Id.*  The attending physician discharged Rivas with a diagnosis of multiple sclerosis.  *Id.*

On April 23, 1981, Rivas was evaluated at the Strabismus clinic.  Tr. 247.  Rivas was still complaining of bilateral INO's and diplopia.  *Id.*  The physician noted Rivas had "no nystagmus, no limited adduction."  *Id.*  However, the physician noted Rivas still had diplopia.  The physician further noted "not classic for INO or any oculomotor paralysis, but does have . . . esotropia."[6]  *Id.*

On September 3, 1981, Rivas was seen at the Neuro Clinic.  Tr. 225. The physician noted Rivas had a straight gaze but noted Rivas continued to complain of diplopia, horizontal only at distances to the right.  *Id.*  Rivas also reported suffering from bifrontal headaches with nausea but no vomiting.  *Id.*  The physical examination revealed a wide based gait, weak reflexes, slow

---

[5] Evoked responses are particularly useful for detecting cryptic lesions in demyelinating disease, appraising sensory systems in uncooperative infants, substantiating deficits in histrionic patients, and following the subclinical course of disease.  For example, visual-evoked responses may reveal unsuspected optic nerve damage by multiple sclerosis.  *The Merck Manual* 1354 (17th ed. 1999).

[6] Esotropia is the form of stabismus (crossed eyes) in which the visual axes converge; may be paralytic or concomitant, monocular or alternating, accommodative or nonaccommodative.  *Stedman's Medical Dictionary* 598-99 (26th ed. 1995).

mentation, slight left eye abduction, nystagmus on L-gaze but no diplopia. *Id.* The physician ordered more laboratory studies, in particular an EEG.

On the same day, Rivas had an EEG which was reported to be normal. Tr. 227. The requesting physician noted "prob. MS (ataxia & diplopia); recurrent bilateral arm paresthesias with associated headache->nausea->paresthesia.[7]" *Id.*

On November 19, 1981, a physician evaluated Rivas. The physician noted Rivas still had nystagmus and mild ataxia. Tr. 216. Rivas was still having problems walking and was now using a cane. Rivas reported having an episode of urinary incontinence and night shakes. On examination, the physician noted weak reflexes, a loss of peripheral pulses over distal arms and legs, and a wide based unsteady gait. Tr. 217. The physician assessed Rivas with depression and suspected MS. *Id.* The physician arranged a psychological consultation on that day and asked Rivas to return in one month.

On November 19, 1981, a psychiatric nurse evaluated Rivas regarding his need to be seen by the mental health clinic (MHC). Tr. 228-230. Initially, Rivas resisted the idea, but on November 20, 1981, he agreed to be seen at the MHC. Tr. 228. On November 23, 1981, Dr. Jon Bell requested Rivas' memory and concentration deficits be explored at the MHC. *Id.*

An undated Psychiatric Data Base and Assessment also indicates Rivas was interviewed by Robin Lopez, a psychology intern. Tr. 219-223. Ms. Lopez met with Rivas and his wife on December 14 and 28, 1981 and January 4, 12, 15, 19, 1982. Tr. 212-215.

---

[7] Paresthesia is an abnormal sensation, such as of burning, pricking, tickling, or tingling. *Stedman's Medical Dictionary* 1300 (26th ed. 1995).

On December 17, 1981, a physician evaluated Rivas.  Rivas reported no improvement since he was seen on November 19, 1981.  Tr. 211. The physician assessed Rivas with depression and probable MS but noted "no evidence at this time of neuro deficit."  *Id.*  The physician prescribed amitriptyline (Elavil), an antidepressant, 25 mg at bedtime for one week and then increase to 50 mg after one week.  Rivas was given an appointment for three weeks.  *Id.*

On January 7, 1982, Rivas returned for his follow-up appointment.  Tr. 210. Rivas reported no improvement from his last visit.  The physician noted "give away weakness" and assessed Rivas with "severe depression and somatization."  *Id.*  The physician increased the Elavil to 75 mg at bedtime for one week then increase to100 mg at bedtime after one week.  The physician directed Rivas to return in three weeks.

On January 28, 1982, Rivas returned for his follow-up.  The physician noted Rivas was unable to walk without a cane since November 1981.  Tr. 209.  The physician also noted that Elavil 100 mg was not helping Rivas and switched him to desipramine (Norpramin), an antidepressant, 100 mg at bedtime.  The physician assessed Rivas with depression with somatization.  *Id.*  The physician contacted Ms. Lopez to initiate an inpatient psychological evaluation.  The physician also ordered an EMG to rule out peripheral neuropathy.  The physician directed Rivas to return in one month.

On April 5, 1982, the Psychiatric Treatment Plan Problem Sheet indicates Rivas was suffering from depression, sleep disturbance, decreased appetite, weight loss, confusion, constricted affect, paranoid behavior (Tr. 196), neurologic disorder, sensory loss (proximal and distal), urinary frequency and hesitancy (Tr. 197).  The purpose for admission to the psychiatric ward was to clarify the diagnosis, "rule out psychosis and rule out MS."  Tr. 196, 197.

10

In the Psychiatric Data Base and Assessment, dated April 5, 1982, Rivas reported being in heavy combat in Viet Nam.  Tr. 193.  Rivas recalled "fearing for his life both from enemy soldiers as well as his fellow soldiers who he describes as crazy."  *Id.*  Rivas reported witnessing several civilian Vietnamese men, women and children shot by American soldiers and then had their bodies "cut wide open from the neck to their groin."  Tr. 136.  According to Rivas, he also was wounded in Viet Nam and exposed to some kind of "chemical."  *Id.*

On April 5, 1982, Ms. Lopez completed a Psychiatric Intake and Assessment form (Tr.182-186) and noted Rivas appeared profoundly depressed. Tr. 186.  Ms. Lopez also noted Rivas "moved very slowly and laboriously."  Tr. 185.  She diagnosed Rivas with Major Depression. Tr. 186.  Ms. Lopez admitted Rivas to the psychiatric ward for observation and evaluation and directed his treatment be coordinated with "neurology and outpatient therapist."  Tr. 186.

The April 5, 1982 Admitting Note and Admitting Treatment Plan Psychiatric and Medical form indicates the physical examination revealed "loss of sensation to sharp stimulus in sleeve distribution on arms beginning [at the] shoulder and leg distribution beginning [at the] groin."  Tr. 189.  The Initial Diagnostic Impression at the time of admission was "R/O Depression vs multiple sclerosis."  Tr. 190.

On April 6, 1982, Rivas was admitted to the psychiatric ward.  Tr. 177, 187, 162.  The admitting nurse noted Rivas complained of numbness in both arms and legs and was walking with some difficulty with a cane.  Tr. 187.  The admitting physician performed a physical examination (Tr. 165-167) and noted "symmetrical loss of sensation to sharp and dull stimulus" of upper and lower extremities.  Tr. 167.  The physician also noted "no vibrational or positional sense in upper

11

and lower extremities." *Id.* The physician noted abnormalities in his evaluation of the cranial

nerves, gait, biceps reflex, triceps reflex, patellar reflex, achilles reflex, peripheral nerves, sensory

(Tr. 167), fundi (eyes), ears (sensory deficit left ear) (Tr. 165), muscle strength (upper and lower

extremities), and ambulation (Tr. 166). An EMG (electromyogram) of the left upper and lower

extremities dated April 7, 1982, was normal. However, a nerve conduction study indicated "left

ulnar neuropathy." Tr. 160.

On April 6, 1982, Natalie Sachs, a psychology intern, and Dr. William Hansen, a clinical

psychologist, evaluated Rivas. Tr. 204-207. According to Dr. Hansen and Ms. Sachs, Rivas had

been admitted for a more intensive psychological evaluation due to "vegatative (sic) signs and

decreased functioning with some signs of disorganization." Tr. 204. Their provisional diagnosis

was "R/O Depression vs organicity vs adjustment reaction with depression because of decreased

physical functioning." *Id.* The Psychological Assessment Report[8] indicated Rivas appeared

"older than his stated age" and walked "very, very, slowly using a cane." *Id.* Rivas required

assistance in opening doors and in pulling up his chair to a desk. Dr. Hansen and Ms. Sachs

administered the following tests: (1) MMPI; (2) Rorschach; (3) WAIS; (4) Incomplete Sentence

Blank; (5) Thematic Apperception Test; (6) Bender Gestalt; (7) Canter Interference Test; (8)

Trail Making Tests, A & B. The results available in the record indicate as follows:

### 1.  MMPI

The MMPI profile is characteristic of an individual with a schizophrenic thought disorder
with the presence of paranoid delusions, depression, apathy, irritability and social
withdrawal. While the patient has had conduct problems in the past, the profile suggests
that this behavior is not generated by a character disorder but rather the patient's poor

---

[8] It is clear from the record that the Psychological Assessment Report is missing some
pages. Tr. 204-207.

judgment and uneven contact with reality.  Furthermore, the patient maintains his present marginal adjustment by utilizing physical complaints and with his preoccupation with health.  Thus as long as the patient can focus on how bad his body feels he can ignore how confused his thinking can become at times and how poorly he is functioning.

### 2.  WAIS

The patient's intellectual functioning is in the low-normal range.  The patient attained a full IQ of 90, a Verbal score of 88 and a Performance score of 95.  The difference between the patient's verbal and performance scores is not significant, however, there was notable subtest scatter among the different subtests with the vocabulary and digit symbol subtests depressed and the picture completion test elevated.

The patient's extremely poor performance on vocabulary may in part be the consequence of the patient's bilingual development and his resulting difficulty in utilizing abstract thought processes in English.

### 5.  Thematic Apperception Test

The patient tended to describe the card rather than to tell a story about the card.  The patient's responses which stick so closely to the card allows very little thought processes to occur, which is to be expected if he needs to monitor his confusion.  While the patient attributed minimal thoughts or feelings to characters, the patient often confused thoughts with feelings.  The patient was also often confused as to the sex of the characters in pictures.  The patient failed to elaborate on the outcomes or futures of his stories which is indicative of the patient's poor planning ability and his present marginal adjustment in which he appears to have no anxiety about his lack of employment, financial difficulties and limited functioning.  This suggests that the patient will have grave difficulties functioning and supporting himself in the future.

The themes of the patient's stories exhibited depression and hopelessness with several stories involving suicide.  The patient's use of somanticization (sic) to cover up his psychological difficulties was portrayed in one story in which the character had committed suicide, however, the patient was not sure if the suicide was caused by physical or mental problems.  However, the patient stated, "no one in their right mind would kill themself (sic), would they?"

### Tests of Organicity

### 6.  Trail Making Test

The patient's performance on both Trail Making Tests A and B were extremely poor, 2'4" and 6'54" respectfully (sic).  However, the patient's poor performance may be the consequence of the patient's difficulty holding a pencil as well as his inability to recite the alphabet in the correct order.  Therefore, it is not clear whether his extremely poor performance is the result of organicity or these other difficulties.

Tr. 204-205.

On April 13, 1982, Drs. Friedrich, McClure, Picher and Ms. Sachs reviewed Rivas' case. Tr. 154.  The clinicians noted "Psychological testing reviewed and [Rivas] had enough trouble on the brain damage screening tests (R/O conversion symptomology) to suggest further neuropsych testing (at CPH Lab) might be helpful."  *Id.*  The physicians reviewed several psychiatric problems and decided to try to decrease his depression first.  *Id.*

On April 15, 1982, Dr. Freedman, an Associate Professor of Psychiatry and Pharmacology, reported the results of Rivas' 24-hour urinary MHPG.  Rivas had a value of 594, indicating Rivas "should be considered to have an abnormality in brain levels of norepinephrine." Tr. 158.  Dr. Freedman recommended treating Rivas with desipramine.  *Id.*  Dr. Freedman also opined that "[f]ailure of the patient to respond to medication, and continued low levels of MHPG suggests that the blood level of antidepressant should be checked, another antidepressant should be instituted, or electroconvulsive therapy should be considered."  *Id.*

On April 15, 1982, Rivas was discharged with the diagnosis of Conversion Disorder, Dependent Personality, Major Depression, left ulnar neuropathy, internuclear opthalmoplegia and rated "grossly impaired."  Tr. 142, 274-278.  Dr. McClure noted in his discharge summary that "[i]nitially the patient was diagnosed as tentatively suffering from MS, however, Neurology now contends that the patient's rapid deterioration over the last year appears to be psychogenic in nature since they have found poor physical support for a diagnosis of multiple sclerosis."  Tr. 274. Dr. McClure also noted that on admission, Rivas "had vegetative signs, eight-pound loss, early morning awakening, decreased sexual drive, and anhedonia."  Tr. 275.  Dr. McClure stated that "[p]sychological testing suggested that the patient used physical symptoms to defend against a schizoid thought disorder, so that as long as he could focus on how bad his body felt, he could

14

ignore how confused he was." Tr. 275.   Dr. McClure further noted "now has difficulty walking and needs  his wife to take care of all household responsibilities and aid him in eating and dressing." Tr. 274.   Notably, Dr. McClure opined that "[u]ntil the patient has better mechanisms of coping and alternative behaviors to somatization, the patient must cling to his physical symptoms and dependent behavior to defend against further decompensation." Tr. 276.   Dr. McClure summarized Rivas' psychological testing results as follows:

> ### Summary of Psychological Testing Results:
>
> This is a 40-year-old, Hispanic male who utilizes somatic defenses to maintain his present marginal adjustment and to defend against acknowledging his confused thinking, paranoid ideation, and increasingly poor level of functioning.  The patient has poor judgment and uneven contact with reality, which has in the past led to problems with the law and now contributes to the patient's inability to plan appropriately for his future.  In addition, the patient is an extremely dependent individual who uses his physical difficulties to elicit support and help from others.  While the patient experiences anger at others who do meet his demands, the patient cannot express his anger directly, but rather expresses his hostility in an obsequious polite, passive-aggressive style.  The patient's confusion seriously disrupts his performance and interferes with the patient's ability to process and integrate internal and external stimuli.  The patient has a very limited ability to observe whey (sic) he reacts to situations as he does and has an alarming lack of anxiety to increasing detriment in his ability to function.  Finally, while tests of organicity are contaminated by patient's motor difficulties they are only minimally suggestive of possible neurological impairment and neuro-psychological testing may be considered.

Tr. 275. Dr. McClure also noted Rivas had chronic headaches and sweats and chills every 2-3 weeks secondary to nightmares since returning from Viet Nam. Tr. 277.

As previously noted, Social Security Ruling 85-28 requires that before a finding of a medically not severe impairment or combination of impairments is made, the ALJ must evaluate the effects of the impairment(s) on the person's ability to do basic work activities.  SSR 85-28, 1985 WL 56856,  *4 (1985).   Basic work activities include: "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgement, responding appropriately to

supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting." *Id.* at *3; *see also* 20 C.F.R. § 404.1521(b).   "[T]hese basic work factors are inherent in making a determination that an individual does not have a severe medical impairment."   SSR 85-28 at *3.   At step two, the ALJ may screen out only claims that are "totally groundless" solely from a medical standpoint.   The record clearly establishes that this case does not fall into the "totally groundless" category.   Rivas more than met his step-two burden "to make a 'de minimis showing' that his medically determinable impairments, in combination, were severe enough to significantly limit his ability to perform work-related activity" during the period in question.

Citing to *Potter v. Secretary of Health & Human Servs.*, 905 F.2d 1346 (10th Cir. 1990), the ALJ opined that he could not speculate and consider a retrospective diagnosis.   Tr. 44.   In *Potter*, Plaintiff submitted an application for benefits, alleging she had been disabled since 1980 as a result of symptoms associated with multiple sclerosis.   Although Potter was not officially diagnosed with multiple sclerosis until 1995, she asserted her symptoms of multiple sclerosis rendered her disabled since 1980.   Following her application for benefits, her treating physician submitted a supplemental report stating it was conceivable from reviewing Potter's medical records that her symptoms could have been consistent with multiple sclerosis as far back as 1980. Potter's application was denied at all levels of the administrative process.   Potter received a hearing before an ALJ who ruled she was not disabled prior to the expiration of her insured status.   The district court upheld the ALJ's decision.   Potter appealed the district court's ruling. The Court of Appeals for the Tenth Circuit affirmed.   The Court held that, although a treating physician may provide a retrospective diagnosis of a claimant's condition, the relevant analysis was whether the claimant was actually disabled prior to the expiration of her insured status.

16

*Potter,* 905 F.2d at 1348-49.  A retrospective diagnosis without evidence of actual disability was insufficient, especially where the disease is progressive.  *Id.* at 1349.

In this case, the ALJ considered the diagnosis of MS and found the record did not support a definitive diagnosis for MS "for a period in the past or in present."  *Id.*  The ALJ then found "[t]he depressive disorder is not documented by medical evidence as imposing significant limitations to preclude the performance of basic work-related activities prior to the date last insured."  *Id.*  This finding is not supported by substantial evidence.  Moreover, the ALJ did not have to speculate about a retroactive diagnosis.  In this case, Rivas' treating physician specifically diagnosed him with Conversion Disorder/Somatization in January1982 (Tr. 209, 210) and his psychiatrists and psychologists also diagnosed him with Conversion Disorder in April 1982.  Tr. 274.

The essential features of Conversion Disorder is the presence of symptoms or deficits affecting voluntary motor or sensory function that suggest a neurological or other medical condition.  *American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders* 492 (Text Revision 4th ed. 2000) (DSM-IV-TR).  The symptoms are not intentionally produced or feigned.  *Id.*

The record also is replete with evidence of a diagnosis of Major Depression during the period of 1981 and 1982.  Tr. 186, 189, 190, 195, 196, 209, 210, 211, 217.  In fact, Rivas had been receiving antidepressant medication since November 1981 and psychotherapy since October 1981.  Tr. 182.  An ALJ may not substitute his own opinion for a medical opinion.  *See Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 744 (10th Cir. 1993).

In his decision, the ALJ stated:

Moreover, I further question Mr. Rivas' credibility regarding the extent of his functional limitations during the period 15 April 1981 through 31 March 1983.  The record reveals that he did not seek recourse through the appeals process after the initial denial in 1981, nor is there evidence that he filed subsequent applications prior to the date last insured (Social Security Ruling 96-7p).

For the period in question there are medical reports from the Veteran's Administration Hospital for in-patient care in April 1981 and April 1982.  On each occasion, Mr. Rivas was hospitalized for several days.  The first hospitalization occurred from 5 April 1981 to 14 April 1981 and was due to complaints of dizziness, double vision, and disturbance of balance.  Initially, it was thought that multiple sclerosis (MS) was the cause.  However, approximately one year later when he was hospitalized from 6 April 1982 to 15 April 1982, diagnostic tests performed did not support this diagnosis and Mr. Rivas' problems were determined to be of a psychogenic nature.  In fact, the reporting VA examiner noted that Mr. Rivas <u>exhibited no anxiety about the deterioration in his functioning and secondary gain was frankly suspected, as Mr. Rivas' wife had taken over all responsibilities for the home and all of her husband's personal needs</u> (Exhibit 1F/137).

Tr. 43 (emphasis added).  Exhibit 1F is Dr. McClure's "Hospital Summary" of Rivas' April 6 through April 15, 1982 hospitalization.  Tr. 274-278.  The ALJ misinterpreted Dr. McClure's statement.  Dr. McClure stated, "The patient has limited ability to observe his behavior, has minimal anxiety about his symptoms and needs to utilize somatic explanations rather than psychological ones for his decreased functioning."  Tr. 276.  Dr. McClure also stated that Rivas "seemed to have '*la belle indifference'* and showed no anxiety about his deterioration, poor functioning, or concern that Neurology had told him that he does not have MS."  Tr. 276.  The ALJ failed to appreciate that an individual diagnosed with Conversion Disorder "may show *la belle indifference* (i.e., a relative lack of concern about the nature or implications of the symptom) . . . ."  DSM-IV-TR at 495.

Listing 12.07 governs Somatoform Disorders and states in pertinent part as follows:

12.07    Somatoform Disorders: Physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms.

18

The required level of severity for these disorders is met <u>when the requirements in both A and B are satisfied.</u>

A.      Medically documented by evidence of <u>one</u> of the following:

2.      Persistent nonorganic disturbance of one of the following:

a.      Vision; or

b.      Speech; or

c.      Hearing; or

d.      use of a limb; or

e.      Movement and its control (e.g., coordination disturbance, psychogenic seizures, akinesisa, dyskinesia; or

f.      Sensation (e.g., diminished or heightened).

3.      Unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury;

And

B.      Resulting in <u>at least two</u> of the following:

1.      Marked restriction of activities of daily living; or

2.      Marked difficulties in maintaining social functioning; or

3.      Marked difficulties in maintaining concentration, persistence, or pace; or

4.      Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpart P, App. 1, § 12.07 (emphasis added).   The record establishes that Rivas met Listing 12.07 during the period in question.  As to the A criteria, the record confirms that Rivas suffered from coordination disturbance (Tr. 187, 209, 210, 211, 216, 217, 225, 244, 251, 258, 260, 263, 269, 270, 277) and diminished sensation of his upper and lower extremities (Tr. 187, 189, 197, 209, 225, 227, 277, 280).  Rivas also had an "unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that he had a serious disease."  Tr. 274 ("Miss Lopez states that the patient is convinced that all of his problems are medical and denies any ability to improve his situation.  On admission, the patient stated that he

19

had MS although he has been told that most likely he does not have MS.").  Rivas also testified at the October 25, 2000 Administrative hearing that he still believes he has MS.  Tr. 61.

Rivas also met the B criteria.  Rivas' activities of daily living were markedly restricted (Tr. 204-207, 274-278), and he had  marked difficulties in maintaining social functioning (Tr. 191, 198, 213, 215 ).  At the Administrative hearing, Rivas testified he did not trust people and the only friend he had was his wife.  Tr. 61.   Additionally, Rivas had marked difficulties in maintaining concentration. (Tr. 225, 226, 229, 274-278).  Notably, Dr. McClure assessed Rivas as "grossly impaired" on Axis V.[9]  Based on the foregoing the Court finds that Rivas met Listing 12.07 and was disabled for a continuous period of twelve months in 1981-82, which prevented him from engaging in substantial gainful activity.

Additionally, Rivas met Listing 12.04.  Listing 12.04 states in pertinent part:

12.04   Affective Disorders:  Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A.    Medically documented persistence, either continuous or intermittent, of one of the following:

1.    Depressive syndrome characterized by at least four of the following:

a.    Anhedonia or pervasive loss of interest in almost all activities; or

b.    Appetite disturbance with change in weight; or

c.    Sleep disturbance; or

d.    Psychomotor agitation or retardation; or

---

[9] Axis V is for reporting the clinician's judgment of the individual's overall level of functioning.  DSM-IV-TR at 32.

     e.       Decreased energy; or

     f.        Feelings of guilt or worthlessness; or

     g.       Difficulty concentrating or thinking; or

     h.       Thoughts of suicide; or

     i.        Hallucinations, delusions or paranoid thinking;

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.  Rivas' psychiatrist and psychologist reported he suffered from anhedonia, appetite disturbance with weight loss, problems with concentration or thinking, sleep disturbance, decreased energy, and paranoid thinking.  *See* Tr. 275 ("had vegetative signs, eight-pound loss, early morning awakening, decreased sexual drive, and anhedonia); Tr. 204-205 ("vegetative signs with decreased functioning with signs of disorganization"and "presence of paranoid delusions").  Rivas' 24-hour urinary MHPG also indicated abnormally low brain levels of norepinephrine.  Tr. 158.

       Having meticulously reviewed the entire record, the Court finds that the ALJ's finding that Rivas "did not have any impairment or impairments that significantly limited his ability to perform basic work-related activities," and thus "did not have a 'severe' impairment or combination of impairments during any relevant period" is not supported by substantial evidence.   Accordingly, the decision of the ALJ is reversed and remanded to the Commissioner for an immediate award of benefits as of November 7, 1981.

       Rivas previously filed an application for disability insurance benefits that was denied on November 6, 1981.  Tr. 118.  However, Rivas did not appeal the denial of this application.  The ALJ also declined to reopen any prior determinations.  Accordingly, the Commissioner contends the doctrine of *res judicata* bars the Court from considering Rivas' disability for all times prior to

November 6, 1981.  Therefore, the Commissioners asserts the relevant period for Rivas' current claim begins on November 7, 1981, the date after his prior application was denied.

Because a refusal to reopen a prior determination is not a final decision within the meaning of 42 U.S.C. § 405(g), the Court is without jurisdiction to review the Commissioner's refusal to reopen Rivas' prior application.  *See Califano v. Sanders,* 430 U.S. 99, 107-09 (1977); *Brown v. Sullivan*, 912 F.2d 1194, 1196 (10th Cir. 1990).  Absent a colorable claim of constitutional deprivation, the Court is without jurisdiction to review the Commissioner's decision.  *Nelson v. Secretary of Health and Human Servs.*, 927 F.2d 1109, 1111 (10th Cir. 1990).   However, Social Security Ruling 91-5p allows a claimant to request the Commissioner reopen a claim because of alleged mental incompetency.  SSR 91-5p, 1991 WL 208067, at *1.  Social Security Ruling 91-5p states that when a claimant shows that "mental incapacity prevented him or her from timely requesting review of an adverse determination," a prior claim may be reopened "regardless of how much time has passed since the prior administrative action."  *Id.* at *2.  Rivas is not precluded from making this argument on remand.

A judgment in accordance with this Memorandum Opinion will be entered.



_____

**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**